CHASEZ, Judge.
Plaintiff, June Theriot Smith, individually and as administratrix of the estate of her minor children, Georgia Lee Smith and Debra Kay Smith, filed this action against defendant, Kaiser Aluminum and Chemical Corporation, seeking to recover workmen’s compensation benefits allegedly due as a result of the demise of George Smith, plaintiff’s husband.
After trial on the merits judgment was rendered by the lower court in favor of the plaintiff and against the defendant. From this adverse judgment defendant sus-pensively appealed to this court.
George Smith was employed by defendant as a pot operator in its Chalmette plant. On May 1, 1970 he began work at 7:00 A.M. and progressed through his normal duties. Entailed in this work is the sweeping of 18 pots used for melting ore and tapping the metal on 11 pots. In sweeping out the pots or furnaces an operator will cause ore to descend a chute into a pot. Once the pot is properly filled with ore a wire broom weighing approximately four pounds is utilized by the operator to sweep the grates over a pot and remove the excess ore thus sweeping the deck plate clean and pushing ore against an anode. In tapping a pot a metal check is taken by punching a hole in the crust of the bath found in a pot. The hole is produced by means of a “T-bar” weighing approximately six pounds or a larger bar or rod that weighs approximately 20 to 25 pounds if resistance is met. Once a hole is made, a metal rod is inserted into the bath, from this a sample is given showing how much metal and how much bath is contained in each pot. For each exercise an operator must lean over an open doored pot to accomplish his task. Temperatures of these pots being worked on vary from 950 degrees centigrade (approximately 1742 degrees Fahrenheit) to over 1000 degrees centigrade (1832 degrees Fahrenheit) in some pots.
The sweeping and tapping of these pots is usually accomplished within an hour’s time. From the evidence contained in the record it does not appear that the deceased met with any unusual difficulty that day.
After finishing his work Smith took his break in an air conditioned lunchroom where he purchased a carton of milk and some doughnuts from a vending machine. At about 8:10 A.M. or ten minutes after finishing his work, plaintiff had a sudden heart attack and died immediately.
It appears from the record that no outward manifestations symptomatic of a heart attack were exhibited by Smith. By this we mean that no complaint of vascular associated pain was ever uttered by the deceased. He appeared outwardly to exhibit a good nature and appetite. We do note that Smith was perspiring profusely and, as one witness described it, more than usual. He also arrived in the lunchroom displaying signs of rapid breathing or shortness of breath. It is, however, inconclusive as to whether or not these facts were symptomatic of on-going heart distress, or were in fact attributable to the work just previously performed. Consid *607 ered in the light most favorable to the defendant, it certainly indicates the strenuous nature of the duties performed by the deceased and the heat Smith was subjected to during his labor.
There is disagreement as to the temperatures plaintiff worked in as no exact measurements are made on a daily basis. Measurements taken by defendants work safety supervisor indicate that temperatures will vary anywhere from 82 degrees Fahrenheit to 120 degrees Fahrenheit. Humidity also fluctuates, but measurements showing humidity are based on averages of the temperatures and thus are not truly reflective of conditions present. However, we note that overall humidity readings were from 21% to 40% when the relative humidity outside the plant was estimated at an average of 52% and the temperature gauge at 77 degrees Fahrenheit.
Weather bureau reports indicate that on May 1, 1970 the temperature at the New Orleans Airport ranged from 70 degrees to 82 degrees from 6:00 A.M. to 9:00 A.M. and the relative humidity was from 93% to 67%, indicating that on the day of Smith’s demise it was hotter and the humidity was higher than when defendant’s employee obtained his measurements.
An autopsy revealed severe atherosclerosis with the deceased’s major coronary arteries 80% to 90% occluded. The disease had advanced over a long period of years to the point where Smith was only receiving ten to twenty percent of the normal amount of blood his heart needed to function. There was also evidence of chronic lack of blood to various areas of the heart over a lengthy period of time. This is evident by multiple and repeated microscopic infarctions which the deceased himself might not have been aware of during his lifetime.
Medical evidence in this case reflects the uncontroverted fact that atherosclerosis is a degenerative disease which in itself is not caused or accelerated by a man’s work. While the disease created the problem, Smith’s ultimate demise was attributed to ventricular fibrillation.
The issue germane to this case, as it is in most workmen’s compensation cases involving heart failure, is whether or not the work deceased was performing aggravated his condition or accelerated his death. In most cases of this nature, there arises conflicts in medical testimony proffered to the court. One or more doctors declare that the work led to heart failure, while an equal number state that the work did not aggravate the diseased condition. In this seemingly inescapable dilemma the courts are partially aided over the maelstrom by past decisions wherein guidelines are established. The crux of the problem, as in most cases of this type, is the medical interpretation of the objective facts.
Plaintiff’s expert witness contends that decedent’s activities of sweeping and tapping of the aluminum pots, involving physical exertion while leaning over very hot pots, aggravated and accelerated the preexisting congestive heart failure and produced ventricular arrhythmia, which became progressively worse with the ultimate occurrence of ventricular fibrillation. The basis of this conclusion is the fact that excessive heat, coupled with physical exertion, causes an increase in cardiac output and workload and thus the deceased’s heart, already strained by disease, was denied the necessary amount of blood needed for its sustenance. Accordingly, irregularity of the heart beat (arrhythmia) developed.
Defendant’s expert contends that the deceased died from the natural course of the disease. In his opinion, no stimulus was needed to produce the fibrillation, especially in view of the facts that Smith died ten minutes after stopping work and had been working at this particular job for over 18 years. The principal ingredient being Smith’s acclimatization which would accordingly mean he was under less stress, thereby reducing the heart’s workload. The deceased’s lack of symptoms was also *608 felt to indicate that his death was not work related.
The trial court judge was convinced that plaintiff had carried the burden of proof necessary to establish her claim. We find no manifest error in this conclusion. Courts must interpret the significance of medical testimony in light of the degrees of certainty required to establish by legal standards the right of compensable recovery. Much is written of the difficulty in proving causal connexity between the duties of employment and resultant disability, or death, from vascular diseases. In Bertrand v. Coal Operators Casualty Company, 253 La. 1115, 221 So.2d 816, 828 (1969), it was noted:
“Medical experts are unable to determine or state the cause, the time of onset, the rate of or reason for acceleration or regression of arteriosclerosis or coronary sclerosis. A plaintiff cannot be required to submit more proof than is here offered that he has suffered disability by reason of a causally connected accident when any additional proof must come from a science whose practitioners admittedly lack complete and exact knowledge of many aspects of the disabling disease and whose views are often divergent and vacillating.”
In the present case defendant’s medical expert did agree that heat, humidity, and atmospheric conditions cause an increase in cardiac output. His reliance on acclimatization is not specifically borne out when it is understood that a heart affected by disease will not acclimatize as much as a normal heart would. The stress placed on a diseased heart to continue functioning is greater than the stress incurred upon a normal heart. Defendant’s medical expert also testified that the ten minutes the deceased was in the air-conditioned lunchroom was enough for one who is acclimated to allow the heart to return to normal following the stress incurred from the heat and physical activity. He also testified that this conclusion was an assumption because there is no evidence, one way or the other, to indicate its veracity. Both experts agreed, however, that a diseased heart takes longer to diminish its output, as opposed to a normal heart. In other words, there is no way of knowing how long it takes a diseased heart to return to normal after incurring a stress producing condition.
It is also important to note that the disease afflicting Smith is a type that progressively degenerates, which, regardless of acclimatization, continually weakens the heart.
A major stumbling block stressed by the defendant was the fact that Smith was asymptomatic of any heart failure or difficulty. In fact, Smith was apparently in good humor (as was his custom) until the moment of death. Defendant contends that this indicates Smith was undergoing no difficulty which related to his work. It should be noted, however, that Smith’s heart was previously scarred from what was termed microscopic infarctions, (evidence indicated injury as recent as two months prior to the fatal attack). Yet from his past history we find that Smith had never complained of any heart trouble before. Additionally, plaintiff’s medical expert testified that Smith, in all probability, was experiencing a “heart flutter” before the onset of ventricular fibrillation. Such “flutters” are common to everyone and often go without complaint from individuals experiencing them. Further, plaintiff’s expert was adamant in his belief that the heat and physical stress incurred by Smith from his work precipitated or triggered the irregular heartbeat with death the ultimate result. Although no written reasons were given by the trial judge, he had to base his decision on the testimony as proffered by plaintiff’s expert. We can find no manifest error in this conclusion; to our minds we find ample evidence to support plaintiff’s contentions.
In Brown v. Kaiser Aluminum & Chemical Corporation, 250 So.2d 99, 104 (La. *609 App., 4th Cir., 1971); writ denied 259 La. 807, 253 So.2d 66 (1971), it was held:
“All that claimant is legally required to establish is that the decedent’s customary and usual duties of employment directly contributed to the employee’s demise, it being unnecessary that the injury be the result of unusual physical effort, or that it is the exclusive cause of the disability or death. Griffin v. Employers’ Liability Insurance Company, 186 So.2d 349 (La.App. 4th Cir. 1966); Turner v. Howard Motors, Inc., 192 So. 2d 205 (La.App. 4th Cir. 1966). It is of no legal significance that a preexisting heart condition, i. e., arteriosclerosis and/or myocardial infarction may also have played a role in the occurrence of death. Guerrera v. City of New Orleans, 212 So.2d 223 (La.App. 4th Cir. 1968); and Garvin v. City of New Orleans, 243 So.2d 347 (La.App. 4th Cir. 1971).”
As noted earlier, decedent’s work was of a physical nature which stresses a diseased heart by increasing blood pressure, pulse and output in compensation. We also find Smith worked under extremely heated conditions and not just relatively warmer circumstances as the defendant suggests.
As in any case involving medical probabilities and possibilities (the two terms sometimes being legally inconclusive) a good deal of common sense must be utilized in establishing cogent understanding of work related inducements or aggravations of preexisting cardiovascular disease. We are therefore convinced that the work discharged by the deceased on that fatal day, although no more or no less than usually performed, aggravated and accelerated the diseased condition of the heart such that it was no longer able to sustain the burden imposed upon it. It is well understood that heat and physical exertion increase the workload of a heart and in the present case such stress was occasioned on an already severely diseased heart, causing an aggravated condition to transpire.
Finding no manifest error in the judgment of the lower court we therefore affirm for the above and foregoing reasons the judgment as rendered.
Affirmed.